**IN THE UNITED STATES DISTRICT COURT**
**EASTER DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**SHERRON LANGEL**                                                      **PLAINTIFF**

**v.**                        **Case No. 4:17-cv-00496 KGB**

**ARKANSAS FOUNDATION FOR**
**MEDICAL CARE,** *et al.*                                    **DEFENDANTS**

## <u>OPINION AND ORDER</u>

Before the Court is defendants Arkansas Foundation for Medical Care ("AFMC") and Tonisa Bourn's motion for summary judgment (Dkt. No. 38). While the defendants' motion for summary judgment was pending, but before plaintiff Sherron Langel filed a response to the motion, the Court granted a joint request for a settlement conference and motion for stay of the Court's final scheduling order to allow for settlement discussions (Dkt. No. 48). The Court lifted the stay in an Order entered April 13, 2021 (Dkt. No. 73). Ms. Langel filed two motions for extension of time to file a response to defendants' motion for summary judgment, and defendants opposed neither motion (Dkt. Nos. 45, 47). The Court grants Ms. Langel's motions for extension of time and considers her response filed timely (Dkt. No. 56).

Ms. Langel filed a response in opposition to defendants' motion for summary judgment and her own attendant statement of facts (Dkt. Nos. 56, 57). Defendants filed a reply to Ms. Langel's response (Dkt. No. 58). Ms. Langel then filed a response to defendants' statement of undisputed material facts (Dkt. No. 59). In response, defendants moved to strike Ms. Langel's response to defendants' statement of undisputed material facts, and Ms. Langel responded in opposition to that motion (Dkt. Nos. 60, 62).

AFMC also filed a motion for protective order with respect to requests for admission propounded by Ms. Langel after summary judgment briefing closed (Dkt. No. 66). Ms. Langel

responded in opposition to the motion for protective order, acknowledging the timing of the requests for admission but claiming the requests do not constitute discovery (Dkt. No. 68).

Defendants submitted a notice of recent relevant authority (Dkt. No. 72 (attaching *Brown v. Dignity Health*, No. CV-18-03418-PHX-JJT, 2020 WL 3403088, at *1 (D. Ariz. June 19, 2020), *appeal dismissed,* No. 20-16398, 2020 WL 8184715 (9th Cir. Nov. 13, 2020)).

For the following reasons, the Court grants defendants' motion for summary judgment as to Ms. Langel's federal race discrimination and retaliation claims; declines to exercise supplemental jurisdiction over Ms. Langel's remaining state law claims and dismisses those claims without prejudice; grants Ms. Langel's two motions for extension of time to file a response to defendants' motion for summary judgment and considers her response timely filed; grants in part and denies in part defendants' motion to strike; and denies as moot AFMC's motion for protective order (Dkt. Nos. 38, 45, 47, 60, 66).

## I.      Overview Of Litigation

Ms. Langel brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), to recover damages from AFMC for the alleged unlawful discriminatory employment practices to which Ms. Langel claims she has been subjected, including a hostile work environment and retaliation (Dkt. No. 20, at 1).[1] Ms. Langel contends that she has suffered damages on account of disparate treatment based on her race (*Id.*). Further, Ms. Langel asserts a claim based on an alleged workplace assault and battery committed against her by Tonisa Bourn, a supervisor in the AFMC service center and, according to Ms. Langel, an indirect supervisor of Ms. Langel's, and based on an alleged workplace assault committed against

---

[1] The Court observes that Dkt. No. 20 and Dkt. No. 20-1 are identical in content; the attorney signature is included on Dkt No. 20-1.

her by Charlotte Hicks, Ms. Langel's direct supervisor at AFMC (Dkt. Nos. 20, ¶¶ 37-39; 52, ¶¶ 94-97, 121-22; 59, ¶ 12).  Finally, Ms. Langel alleges *respondeat superior* derivative liability and failure to supervise against AFMC (Dkt. No. 20, at 1).  Defendants moved for summary judgment and filed a statement of undisputed facts (Dkt. Nos. 38, 40).  Ms. Langel filed her own statement of material facts, supplemental statement of materials facts, and response to defendants' statement of undisputed material facts (Dkt. Nos. 52, 57, 59).

## II.   Motion For Protective Order

Pending before the Court is AFMC's motion for protective order with respect to requests for admission propounded by Ms. Langel after summary judgment briefing closed (Dkt. No. 66). After the parties conducted an unsuccessful settlement conference, this Court entered a Third Amended Scheduling Order that included a new trial date but did not include a new discovery deadline (Dkt. No. 63).  Despite that, Ms. Langel propounded requests for admission to AFMC. AFMC moved for a protective order requesting that the Court strike as untimely Ms. Langel's requests for admission.  Ms. Langel responded in opposition to the motion for protective order, acknowledging the timing of the requests for admission but claiming the requests do not constitute discovery (Dkt. No. 68).

The summary judgment briefing in this case was complete before this dispute arose; the responses to the requests for admission were not intended to aid Ms. Langel in responding to the pending motion for summary judgment.  Given the Court's ruling on the pending motion for summary judgment, the Court denies as moot AFMC's motion for protective order; AFMC need not respond to the pending requests for admission (Dkt. No. 66).

### III.   Motion To Strike

Ms. Langel filed a response in opposition to defendants' motion for summary judgment and her own attendant statement of facts; she did not initially respond to defendants' statement of undisputed facts (Dkt. Nos. 56, 57).   Defendants filed a reply to Ms. Langel's response, highlighting this deficiency (Dkt. No. 58).   Ms. Langel then, without leave of the Court or defendants' permission, filed a response to defendants' statement of undisputed material facts (Dkt. No. 59).   In response, defendants moved to strike Ms. Langel's response to defendants' statement of undisputed material facts, and Ms. Langel responded in opposition to that motion (Dkt. Nos. 60, 62).

The Court notes that Local Rule 56.1 of the Local Rules of the United States District Court for the Eastern and Western Districts of Arkansas provides that all material facts set forth in the statement filed by the moving party shall be deemed admitted unless controverted by the statement filed by the non-moving party.   *See* Local Rule 56.1(c).   Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c)(2).

The party moving for summary judgment bears the initial responsibility of informing the Court of the basis for the motion and must identify those portions of the record which the moving party believes demonstrate the absence of a genuine issue of material fact.   *Torgerson v. City of Rochester,* 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).   If the moving party does so, the party opposing the motion must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial.   *Id.*   The party opposing the motion must do more than simply show that there is some metaphysical doubt as to the material facts.   *Id.*

Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Id.*; *see also Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012). Further, the standard is not whether the evidence at the summary judgment stage would be admissible at trial – it is whether it could be presented at trial in an admissible form. *See* Fed. R. Civ. P. 56(c)(2); *see also Gannon Int'l*, 684 F.3d at 793.

Applying these standards to the record before it, the Court grants in part and denies in part defendants' motion to strike (Dkt. No. 60). Defendants move this Court to strike Ms. Langel's response to defendants' statement of undisputed material facts (Dkt. No. 62). The Court declines to do so. The Court relies on Ms. Langel's filing and on facts she admits are undisputed in reaching its decision on the pending motion for summary judgment filed by defendants. As for Ms. Langel's own statement of facts, where those assertions are unsupported by citations to record evidence that could be presented at trial in an admissible form, the Court grants defendants' motion to strike those assertions and has not considered those assertions in reaching its determination here.

IV.     **Factual Background**

The following facts are taken from the parties' filings, the Court having ruled on defendants' motion to strike.

AFMC is a non-profit organization that engages with beneficiaries and health care providers to improve the quality of overall health care as well as consumers' experience of health care in Arkansas, while reducing health care costs (Dkt. No. 40, ¶ 1). As a part of its mission, AFMC operates a call service center that primarily provides troubleshooting for Arkansas consumers relating to Medicaid benefit issues (*Id.*, ¶ 3). AFMC's service center is comprised of approximately 60 employees and temporary agents who work in various capacities relating to Arkansas's Medicaid beneficiary health service issues (*Id.*, ¶ 4). During 2016 and 2017, the service

center was comprised of a manager, Amy Bryant, assistant manager, Matthew Martin, and four supervisors of different "teams" who worked on various contracts, with some teams having "Team Lead" positions (*Id.*, ¶ 5).

AFMC has an Employee Handbook that prohibits discrimination, harassment, and violence in its workplace (Dkt. Nos. 38-9; 40, ¶ 6).  The harassment prevention policy contains a grievance procedure for employees to report perceived harassment (Dkt. No. 40, ¶ 7).  Ms. Langel contends that this policy was not appropriately implemented, alleging that black female employees tended to suffer retaliation when they engaged in the AFMC grievance procedure, and, even when retaliation did not result from the report of supervisory misconduct at AFMC, Ms. Langel contends that the employee complaints often went unaddressed and were omitted from the offending supervisor's personnel file (Dkt. No. 59, ¶ 7).  Ms. Langel was provided a copy of the Employee Handbook, and Ms. Langel and other AFMC employees received harassment training provided by AFMC, which was titled "NoZone for Employees" and dealt with workplace safety (Dkt. Nos. 40, ¶¶ 8-9; 59, ¶ 9).  Ms. Langel contends that this training did not cover harassment, race-based harassment, or retaliation (Dkt. No. 59, ¶ 9).

The handbook also defines employee misconduct and outlines a graded scale that gauges the relative weight of certain types of employee misconduct (Dkt. No. 52, ¶ 26).  It classifies employee misconduct in terms of its overall seriousness, delineating three categories of employee offenses:  Category 1; Category 2; and Category 3 (*Id.*).  Category 1 violations are the most severe and may, but do not necessarily, result in immediate termination (*Id.*; Dkt. No. 52-4, at 27).  Category 3 violations are less serious in nature, unless they are recurring, and will result in progressive disciplinary action up to and including termination (Dkt. No. 52-4, at 30).

Ms. Langel, an African-American woman, was hired by AFMC as a Service Center Representative in March 2016 (Dkt. Nos. 40, ¶ 11; 52, ¶ 1). Ms. Langel was promoted to a Research Analyst position in AFMC's Service Center's Beneficiary Grievance department in September 2016 and received a pay increase for that promotion (Dkt. No. 40, ¶ 11). After her promotion, Ms. Langel's direct supervisor was Charlotte Hicks, and Ms. Langel worked in this position until her resignation on February 22, 2018 (*Id.*, ¶ 12). Ms. Bourn was never Ms. Langel's direct supervisor in the Service Center, although Ms. Langel attempts to characterize Ms. Bourn as an "indirect supervisor" without defining that phrase (Dkt. No. 59, ¶ 18). Ms. Langel denies that she voluntarily resigned from AFMC and instead asserts that she was forced to resign from AFMC due to the stress, ill-effects, and mental anguish caused by the alleged harassment and retaliation she experienced at AFMC (Dkt. No. 59, ¶ 12). Ms. Langel further asserts that this difficult decision was recommended by her physician and that her resignation constitutes a constructive discharge under the law (*Id.*). Defendants dispute Ms. Langel's assertions with respect to her resignation.

At all times, Ms. Langel received good job evaluations during her employment in the Service Center (Dkt. No. 40, ¶ 13).[2] Ms. Langel was never disciplined other than a single verbal

---

[2]    Although she admits that she earned "glowing employee evaluations from her supervisors" prior to July 13, 2017, Ms. Langel asserts her belief that Ms. Hicks gave to her a negative review in September 2017 (Dkt. No. 59, ¶ 13). Ms. Langel cites her belief as some evidence of retaliation but admits the September 2017 evaluation was not produced in discovery (*Id.*). She claims that she is entitled to an adverse inference regarding this evaluation, as a result (*Id.*). Although the Court is required at this stage to construe all reasonable inferences from the undisputed record evidence in favor of Ms. Langel, there is no record evidence that supports imposing the sanction of an adverse inference like Ms. Langel seeks under the circumstances presented. Before such an adverse inference is justified "there must be a finding of intentional destruction indicating a desire to suppress the truth . . . ." *Morris v. Union Pacific R.R.*, 373 F.3d 896, 901 (8th Cir. 2004) (quoting *Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739 (8th Cir. 2004)). No record evidence permits the Court to make such a finding.

7

counseling about being late in completing a particular training course, never applied for any other positions within AFMC, and was provided all requests for time off during her entire employment, though she was sometimes forced to take leave without pay (*Id.*, ¶¶ 14-16; Dkt No. 59, ¶ 16).

In support of her hostile work environment race discrimination claim in this lawsuit, Ms. Langel's complaint highlights three alleged incidents involving Ms. Bourn (Dkt. Nos. 20, ¶¶ 9-15; 40, ¶ 17). First, in December 2016, in Ms. Langel's presence, Ms. Bourn, a Caucasian woman, referred to a group of Hispanic AFMC employees as the "South of the Border" team (Dkt. No. 40, ¶ 17). Second, Ms. Bourn told another employee that she was "gathering her strays" in the Service Center (*Id.*, ¶¶ 17, 25). Third, in March 2017, Ms. Bourn told a group of employees "to not make [her] crack [her] whip" in referencing getting the employees back to work, and this statement came after Ms. Bourn allegedly had previously told an African-American subordinate that she would take her "to [her] shed and crack the whip on her" (Dkt. Nos. 20, ¶ 11; 40, ¶ 17). Ms. Bourn was never Ms. Langel's direct supervisor, though Ms. Langel contends that Ms. Bourn was her indirect supervisor (Dkt. Nos. 40, ¶ 18; 59, ¶ 18).

Regarding the first incident, AFMC employs a bilingual Service Center team comprised of Spanish-speaking employees (Dkt. No. 40, ¶ 19). Ms. Bourn claims that she heard one of those team members, Sandra Zavala, refer to the team as the "South of the Border" team, and Ms. Bourn claims that she learned the term as a result of hearing it from one of the members (*Id.*). Ms. Langel claims that she has never heard anyone from that team refer to themselves as the "South of the Border" team and that Ms. Zavala told Ms. Langel that she was offended by Ms. Bourn's use of that phrase (Dkt. No. 59, ¶ 19). Ms. Bourn states that she has not used the phrase "South of the Border" in the workplace since this incident (Dkt. No. 40, ¶ 20).

Regarding the second incident, Ms. Bourn made the "gathering my strays comment" to another employee, Bridgette Gilbert, in July 2017, while looking for another employee who was not at her work station (*Id.*, ¶ 25).  Ms. Langel did not report the statement at that time, though she does claim that Ms. Gilbert reported it (Dkt. Nos. 40, ¶ 25; 52, ¶¶ 91-92; 59, ¶ 25).  Ms. Bourn's role as a supervisor was to ensure employees were making calls and meeting measurable goals of call efficiencies, which included making sure employees were performing their job duties while working, and Ms. Bourn has not used that phrase since the complaint about its use (Dkt. No. 40, ¶ 26).

Regarding the third incident, Ms. Bourn made a comment to the effect of "don't make me crack my whip" in March 2017 while talking to a group of employees about getting back to work (*Id.*, ¶ 21).  In making this comment, Ms. Bourn was speaking to a group of employees she found talking at a work station who were not answering phones (Dkt. No. 40, ¶ 22).  Though Ms. Langel did not report the "crack the whip" comment to Human Resources at that time, she did notify Ms. Hicks, her supervisor, who informed Ms. Bryant, the Service Center manager, about the comment in accordance with the AFMC handbook provisions on mandatory reporting of observed and perceived employee misconduct (Dkt. Nos. 40, ¶ 23; 52, ¶¶ 32-34; 59, ¶ 23).  Around the same time, Ms. Langel alleges that Ms. Bourn made another statement to Kanesha Woods, an African-American employee, independently, telling Ms. Woods, "don't make me take you to my shed and crack my whip," though Ms. Bourn disputes the "[t]aking them to the shed" part of that comment (Dkt. Nos. 52, ¶ 70; 52-5, at 13; 59, ¶ 21).  Ms. Bryant counseled Ms. Bourn that such language was not appropriate and should not be used because it could be taken as offensive (Dkt. No. 40, ¶ 23).  Defendants assert that Ms. Bourn did not realize the "crack the whip" comment was offensive at the time it was made because Ms. Bourn's mother used it with Ms. Bourn, though Ms. Langel

denies that Ms. Bourn was unaware of the offensive nature of her statements (Dkt. Nos. 40, ¶ 24).

Ms. Bourn has not used the phrase since her verbal counseling (*Id.*).

In support of her battery and assault claims in this lawsuit, Ms. Langel highlights an incident involving Ms. Bourn from July 13, 2017 (Dkt. No. 20, ¶ 12).  On July 13, 2017, Ms. Langel was locked out of her computer because she forgot her log-in credentials (Dkt. No. 40, ¶ 27).  Ms. Langel asked Ms. Bourn for assistance, which Ms. Bourn provided (*Id.*).  During this exchange, Ms. Bourne explained to Ms. Langel that Ms. Bourn writes her information down so that she does not forget it (*Id.*).  Toward the end of the discussion, Ms. Bourn's finger made repeated contact with Ms. Langel's forehead while, based on video footage of the incident, both women appeared to be smiling and engaged in conversation (Dkt. No. 38-7).  Defendants characterize this contact as Ms. Bourn tapping Ms. Langel's forehead, and Ms. Langel characterizes this contact as Ms. Bourn aggressively poking her face without her consent (Dkt. Nos. 40, ¶ 27; 59, ¶ 27).  Ms. Langel testified that the touch to her forehead by Ms. Bourn was painless (Dkt. No. 40, ¶ 28).  During this incident, Ms. Bourn made a comment telling Ms. Langel to use her "little bitty brain" (Dkt. Nos. 39, at 6; 56, at 29).

Ms. Langel reported the touching incident to Ms. Bryant, who was tied up in meetings at the time and who directed her to Mr. Martin (Dkt. No. 40, ¶ 29).  Mr. Martin was also in a meeting at that time, so Ms. Langel went directly to Human Resources (*Id.*).  After the incident, Ms. Bourn, Ms. Langel, Ms. Hicks, and Mr. Martin held a meeting wherein Ms. Bourn apologized to Ms. Langel (*Id.*, ¶ 30).  In Ms. Langel's recollection, Ms. Bourn stated, "From the bottom of my heart, I'm sorry.  I did not mean to belittle, embarrass you, or make you feel any kind of way.  God said before you offend someone hang yourself" (Dkt. Nos. 38-21, at 8; 52-1, at 19).  In Ms. Bourn's recollection, she quoted scripture, stating that "[t]he scripture says that if you offend someone, it

is better that a millstone be tied around your neck and be cast into the sea than to offend someone, one of God's little children.  And that was [her] comment, that it's better that that happen to [her] than to offend [someone]."  (Dkt. No. 38-2, at 24).  Regardless of the apology's phrasing, Ms. Langel testified that she believed the apology was not sincere, though Ms. Langel and Ms. Bourn did hug after the apology (*Id.*).  There have been no other physical touching incidents between Ms. Bourn and Ms. Langel since that day (Dkt. No. 40, ¶ 31).

On July 20, 2017, a week after the touching incident, Ms. Langel reported that, in response to Ms. Langel commenting to Ms. Hicks that there was a work task she was struggling to complete, Ms. Hicks mimicked the touching incident which Ms. Langel considered to be belittling; she emailed Human Resources to complain (Dkt. Nos. 20, ¶ 17; 40, ¶ 32; 57, ¶ 259).

AFMC investigated and addressed both of Ms. Langel's complaints about Ms. Bourn and Ms. Hicks, though Ms. Langel challenges the thoroughness of those investigations and the sufficiency of the discipline taken by AFMC against Ms. Bourn and Ms. Hicks (Dkt. Nos. 40, ¶ 33; 59, ¶ 33).  Ms. Bourn received a written counseling, which resulted in her losing her eligibility for an annual bonus of $1,500, and she was required to attend mandatory training on "Communicating with Tact and Finesse" (Dkt. No. 40, ¶ 35).  AFMC held  a follow-up meeting with Ms. Bourn to confirm that she had completed her required training (*Id.*, ¶ 36).  Ms. Langel alleges that AFMC insufficiently disciplined Ms. Bourn, asserts that the conduct should have been a Category 1 offense rather than the Category 3 violation Ms. Bourn received, and claims that the discipline Ms. Bourn received reflects preferential treatment for the Caucasian violator and a disregard of the claims of an African-American victim (Dkt. No. 59, ¶¶ 33, 35).  Ms. Langel believes the fact that Ms. Bourn was not charged with a Category 1 offense and terminated as a

result of the touching incident reflects racial discrimination and AFMC's tolerance of Ms. Bourn's behavior (Dkt. Nos. 40, ¶ 48; 59, ¶ 48).

AFMC also investigated Ms. Langel's complaint about Ms. Hicks and determined that Ms. Hicks acted unprofessionally towards Ms. Langel (Dkt. No. 40, ¶ 49).   Ms. Hicks received a counseling, which was reflected in an Employee Counseling, and she was placed on an Employee Instructions agreement that required no further demeaning or insulting gestures, even if made in jest (*Id.*, ¶¶ 37, 49).  In her sworn affidavit, Director of Human Resources Mindy Dunn states that Ms. Hicks received "Employee Instructions" as a result of this incident (Dkt. Nos. 38-6, ¶ 14; 38-15; 52-4, at 54).  AFMC ultimately terminated Ms. Hicks, though Ms. Hicks' termination occurred because of progressive issues with job performance including poor work quality or productivity, failure to perform assigned duties using ordinary care and diligence, and failure to follow business practices (Dkt. Nos. 40, ¶ 38; 52-4).  Ms. Langel denies that Ms. Hicks received any counseling related to her mimicking the touching incident, asserting that there is no proof that anyone signed off on a discipline acknowledgment form in the record evidence which would constitute at least some proof that Ms. Hicks was disciplined as AFMC purports (Dkt. No. 59, ¶ 37).[3]

Defendants contend that the conduct by Ms. Bourn and Ms. Hicks that Ms. Langel reported to Human Resources has not occurred since Ms. Bourn and Ms. Hicks were disciplined, but Ms.

---

[3]  Ms. Langel claims repeatedly in her briefing that, due to the lack of a signature from Ms. Hicks on this document, Ms. Langel is entitled to the adverse inference that Ms. Hicks was never disciplined and that AFMC effectively tolerated her conduct (Dkt. No. 59, ¶ 50).  Although the Court is required at this stage to construe all reasonable inferences from the undisputed record evidence in favor of Ms. Langel, there is no record evidence that supports imposing the sanction of an adverse inference like Ms. Langel seeks under the circumstances presented.  Before such an adverse inference is justified "there must be a finding of intentional destruction indicating a desire to suppress the truth. . . ." *Morris v. Union Pacific R.R.*, 373 F.3d 896, 901 (8th Cir. 2004) (quoting *Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739 (8th Cir. 2004)).  No record evidence permits the Court to make such a finding.

Langel disagrees (Dkt. Nos. 40, ¶ 50; 59, ¶ 50).  Ms. Langel contends that Ms. Bourn continued to harass African-American female subordinates after the touching incident and that Ms. Hicks harassed Ms. Langel following the touching incident, leading up to and including the mimicking incident already discussed (Dkt. No. 59, ¶ 50).

None of the complained of conduct by Ms. Bourn and/or Ms. Hicks has occurred at AFMC since the complaints (Dkt. No. 40, ¶ 40).  As supervisors, Ms. Bourn and Ms. Hicks were required to relate professionally and positively with all staff (*Id.*).  Ms. Bourn stated that she had never touched another employee before Ms. Langel, though Ms. Langel alleges that Ms. Bourn has hugged other employees before (Dkt. Nos. 40, ¶ 41; 59, ¶ 41).  Ms. Bourn has not touched an employee since the incident with Ms. Langel (Dkt. No. 40, ¶ 41).  All AFMC employees, including Ms. Bourn and Ms. Hicks, attend mandatory training including training relating to harassment prevention, ethics and compliance, and other skill-based training (Dkt. Nos. 38-6, ¶ 6; 40, ¶ 42).  Additionally, all AFMC employees, including Ms. Bourn and Ms. Hicks, receive a copy of AFMC personnel policies upon hire, which include an Equal Opportunity/Non-Discrimination policy and a Harassment Prevention and Reporting policy and procedure (Dkt. Nos. 38-6, ¶ 7; 40, ¶ 42).

Additionally, in July 2017, AFMC's Benefit Grievance team, of which Ms. Langel and Ms. Hicks were both members, was moved to the larger of AFMC's two buildings ("the black building") for operational purposes (Dkt. No. 40, ¶ 51).  Ms. Langel acknowledges that Ms. Hicks, who is Caucasian, was moved as part of the team (Dkt. No. 59, ¶ 51).  Previously, in December 2016, this team had been moved from the black building to the smaller of AFMC's two buildings ("the white building") along with the entire Service Center (Dkt. Nos. 38-6, ¶ 15; 52, ¶ 65).  Following that transfer, AFMC received a new contract, and operations managers determined that the Beneficiary Grievance team should be moved back to the black building to assist on the new

contract (Dkt. No. 38-6, ¶ 15).  Ms. Langel alleges that the December 2016 move to the "inferior" white building constituted a form of retaliation because she and her team members were growing increasingly vocal in their complaints about inappropriate racially-tinged comments in the workplace, and Ms. Langel alleges that the July 2017 move back to the black building constituted a form of retaliation by putting her closer to Ms. Bourn for complaining about the touching incident and the hostile work environment she experienced (Dkt. Nos. 52, ¶¶ 65, 133; 59, ¶ 51).

Ms. Langel also asserts that she has provided evidence of dozens and dozens of further instances of hostile work environment activity and retaliation spanning from 2016 to 2018 (Dkt. Nos. 52; 59, ¶ 17).  Among these allegations, Ms. Langel claims that:  Ms. Bourn asked a group of Latino employees gathered near her desk, "what are you doing on my side of the fence?" (Dkt. No. 56, at 22); Derrick Edwards, a Caucasian AFMC employee, joked about his irritation with a Medicaid beneficiary, saying that he would like to drive the beneficiary "across the border" himself, Ms. Bourn and Mr. Martin both laughed, and Mr. Martin purportedly ratified the comment (*Id.*, at 23); Mr. Martin stated that his personal goal was to "make this call center great again," which Ms. Langel construes as racist (*Id.*); Ms. Bourn, in a sustained fashion, allegedly harassed and retaliated against Khalisha Bozeman, an African-American call taker who claims to have witnessed multiple racial incidents involving supervisors in the AFMC workplace during the same timeframe as alleged in Ms. Langel's complaint and which Ms. Langel contends are similar to her allegations[4] (*Id.*, at 23-24); Ms. Bourn purportedly harassed and retaliated against three African-

---

[4] The Court has reviewed the record evidence, including Ms. Bozeman's declaration (Dkt. No. 52-11).  Aside from alleging certain facts specific to her with respect to alleged discriminatory promotion, Ms. Bozeman repeats nearly all of the allegations made by Ms. Langel with respect to comments by Ms. Bourn, conduct by Ms. Bourn, conduct by Ms. Hicks, and a comment by Derrick Edwards.  To a large extent, her allegations repeat the allegations made by Ms. Langel.

American call takers Lillian Killion, LaRhonda Buckner, and Brenda Carter[5] (*Id.*, at 25-26); AFMC Team Leader Que Kelley allegedly retaliated against Ms. Langel by refuting key aspects of her complaint about the touching incident (*Id.*, at 30-31); Ms. Hicks began a "general retaliation campaign" of harassment against Ms. Langel for reporting the touching incident and past supervisor misconduct, which primarily involved Ms. Hicks taking notes about Ms. Langel that Ms. Langel asserts fabricated or exaggerated her behavior (*Id.*, at 31-32); Ms. Bryant, Ms. Bourn, Ms. Hicks, and Ms. Kelley allegedly retaliated against Ms. Langel by considering implementing random drugs screens and falsely reporting to Human Resources that Ms. Langel used drugs (*Id.*, at 35-36); AFMC through its Director of Human Resources, Ms. Dunn, allegedly retaliated against Ms. Langel by withholding video of the touching incident and hindering her efforts to have Ms. Bourn prosecuted (*Id.*, at 36-38); Ms. Bourn and Ms. Hicks' supervisor evaluations do not mention the touching incident and the mimicking incident, respectively (*Id.*, at 38-39); AFMC Manager Sheryl Hurt allegedly engaged in retaliation against Ms. Langel for reporting supervisory harassment and misconduct, summed up in an email exchange between Ms. Hurt and Ms. Langel (*Id.*, at 39-41); Ms. Dunn purportedly harassed and retaliated against Ms. Carter for revealing to Ms. Langel that AFMC had video footage of the touching incident, making her "life a living hell" and causing her significant medical harm (*Id.*, at 43); Mr. Martin allegedly "attested" to the validity

---

[5] The record evidence submitted by Ms. Langel in support of her response includes a sworn declaration from Ms. Bozeman and Brenda Carter (Dkt. Nos. 52-11, 52-13).  There are no sworn statements in the record evidence from any other individuals identified by Ms. Langel.  In her declaration, Ms. Carter claims that, after she disclosed to Ms. Langel that video of the incident with Ms. Bourn existed, AFMC "management" made her life a "living hell" by calling her to the office almost daily and making her wait to speak to management until multiple people could attend a meeting with her and by Ms. Dunn accusing her of unspecified lying (Dkt. No. 52-13).

of Ms. Kelley's racial discrimination and retaliation claims against AFMC[6] (*Id.*, at 44); Ms. Bourn purportedly continued to harass Ms. Buckner and Ms. Bozeman in late 2017 throughout most of 2018 (*Id.*, at 44-45); Ms. Bourn's aggression toward African-American women at AFMC culminated in June 2018 with her confronting Ms. Bozeman while supposedly brandishing a kitchen knife[7] (*Id.*, at 45-47); Ms. Bryant allegedly favored Caucasian subordinates and violated the AFMC employee handbook by disciplining too lightly—or not at all—some of her subordinates, including Ms. Bourn (*Id.*, at 48); Mr. Martin allegedly favored Caucasian subordinates and engaged in unethical workplace conduct by failing to discipline properly his subordinates, including Ms. Bourn, and failing to supervise his subordinates adequately (*Id.*, at 48-49); and Ms. Hicks purportedly received work accommodations from AFMC prior to her unrelated termination for poor work performance (*Id.*, at 49-50).

From July 2017 to February 2018, Ms. Langel applied for and was granted intermittent leave pursuant to the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601, *et seq.* (Dkt. No. 40, ¶ 45). Ms. Langel asserts that she was also forced to take medical leave without pay ("LWOP") as a result of the harassment, retaliation, and hostile work environment of which she complains in her complaint (Dkt. No. 59, ¶ 45). Ms. Langel missed much work, and she only worked one or two weeks in all of 2018 (Dkt. Nos. 40, ¶ 45; 59, ¶ 45).

---

[6] The record evidence includes Mr. Martin's witness statement, in which he says, "Que Kelley had an issue as to why she was receiving an occurrence for not meeting quota. Her concern is legit because the policy is unclear as to whom the quota applies to. She expressed her concern to me and went to HR to express her concerns because from her knowledge no one else had received an occurrence for not meeting quota when she receives the same nightly reports that list everyone's cases." (Dkt. Nos 52-15). As a result, the Court cannot conclude, as Ms. Langel advocates, that such a statement categorizes "Ms. Kelley's complaint about unequal treatment and uneven discipline at AFMC" as "legit" (Dkt. No. 56, at 44).

[7] The Court notes that the "knife incident" that Ms. Langel references in her briefing occurred in June 2018, nearly six months after she resigned from AFMC (Dkt. No. 58, at 17).

On July 19, 2017, Ms. Langel met with the Equal Employment Opportunity Commission ("EEOC") in Little Rock (Dkt. Nos. 38-21, at 1; 40, ¶ 43).  Ms. Langel alleged discrimination based on race and retaliation (Dkt. No. 40, ¶ 43).  The EEOC compiled intake notes from two meetings with Ms. Langel, ultimately dismissed the charge, and provided Ms. Langel with a Right to Sue Letter (*Id.*).  Ms. Langel initiated this lawsuit *pro se* on August 4, 2017 (Dkt. No. 2).  Ms. Langel continued working at AFMC until February 2018 (Dkt. No. 39, at 3).  She was cleared to return to work without restrictions on February 22, 2018, but she resigned instead on that date purportedly at the recommendation of her psychologist (Dkt. Nos. 38-12; 40, ¶¶ 44, 46; 59, ¶ 46).  Ms. Langel never requested from AFMC a job transfer or change of departments (Dkt. No. 40, ¶ 47).  Ms. Langel denies that she voluntarily resigned and asserts that she was forced to resign from AFMC due to the stress, ill-effects, and mental anguish caused by the harassment and retaliation she claims she experienced at AFMC and upon the purported recommendation of her physician (Dkt. No. 59, ¶ 44).  Ms. Langel maintains that her resignation constitutes a constructive discharge under the law (*Id.*).

Ms. Langel also contends that she was placed on an industry "do not re-hire" list after forcing her constructive termination (Dkt. No. 20, ¶ 32(g)).  Citing only her own affidavit, Ms. Langel contends that it is known at AFMC and within the industry that placement on AFMC's "do not rehire" list is tantamount to being blacklisted in the healthcare industry because of the influence AFMC has in the State (Dkt. Nos. 52, ¶ 167; 52-2, ¶ 59).  Defendants respond that there is no "industry do not hire" list to their knowledge, but rather that AFMC simply indicates on internal personnel forms whether an employee is eligible for re-hire or not, with criteria including whether the employee gave two weeks' notice, which Ms. Langel did not (Dkt. No. 40, ¶ 54).  Further, AFMC includes record evidence demonstrating that, in response to an inquiry about whether Ms.

Langel is eligible for rehire at AFMC, AFMC responds that company policy prohibits a response to the inquiry (Dkt. No. 38-6, at 5). Ms. Langel asserts that there is an effective industry "blacklist" which is embodied in AFMC's "do not rehire" list (Dkt. No. 59, ¶ 54).

### V.    Legal Standard

Summary judgment is appropriate if there is no genuine issue of material fact for trial. *UnitedHealth Group Incorporated v. Executive Risk Specialty Ins. Co.*, 870 F.3d 856, 861 (8th Cir. 2017) (citing Fed. R. Civ. P. 56). Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In ruling on a motion for summary judgment '[t]he district court must base the determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial.'" *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 923-24 (8th Cir. 2004) (internal citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Johnson Reg'l Med. Ctr. v. Halterman*, 867 F.3d 1013, 1016 (8th Cir. 2017) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989) (citation omitted).

However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact.

*Celotex Corp.*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial.  *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008), *cert. denied*, 522 U.S. 1048 (1998).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).

Importantly, "[t]here is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial."  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc) (citing *Fercello v. County of Ramsey*, 612 F.3d 1069, 1077 (8th Cir. 2010)).  "Although employment discrimination cases are 'often fact intensive and dependent on nuance in the workplace, they are not immune from summary judgment.'"  *Trierweiler v. Wells Fargo Bank*, 639 F.3d 456, 459 (8th Cir. 2011) (quoting *Fercello*, 612 F.3d at 1077).

## VI.    Analysis

Ms. Langel's amended complaint alleges four counts: a race-based hostile work environment at AFMC in violation of Title VII (Count I), workplace retaliation in the form of harassment and intimidation for reporting supervisory misconduct (Count II), assault and battery in violation of Arkansas law (Count III), and failure to supervise in violation of Arkansas law (Count IV) (Dkt. Nos. 20; 56, at 1-2).  The Court considers first Ms. Langel's two federal claims.

### A.    Hostile Work Environment

A plaintiff's race discrimination claim can survive a motion for summary judgment in one of two ways.  *See Humphries v. Pulaski Cty. Sch. Dist.*, 580 F.3d 688, 692 (8th Cir. 2009).  First, a plaintiff "may present admissible evidence directly indicating unlawful discrimination, that is, evidence showing a specific link between the alleged discriminatory animus and the challenged

19

decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 863 (8th Cir. 2008) (citing *Russell v. City of Kan. City, Mo.*, 414 F.3d 863, 866 (8th Cir. 2005)). Alternatively, a plaintiff "may present evidence 'creating an inference of unlawful discrimination under the burden-shifting framework established in *McDonnell Douglas*.'" *Humphries*, 580 F.3d at 692 (quoting *Fields,* 520 F.3d at 863-64). Evidence of a Title VII violation is direct "if it establishes 'a specific link between the [alleged] discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the employer's decision." *Putman v. Unity Health Sys.*, 348 F.3d 732, 735 (8th Cir. 2003) (quoting *Thomas v. First Nat'l Bank of Wynne,* 111 F.3d 64, 66 (8th Cir. 1997)). Under this definition, Ms. Langel has not presented direct evidence of a Title VII violation; therefore, the Court will apply the burden-shifting framework established by the United States Supreme Court in *McDonnell Douglas Corporation v. Green*. *See* 411 U.S. 792, 802-04 (1973).

To establish a race-based hostile work environment claim alleging discriminatory conduct by a supervisor, "a plaintiff must show that (1) he or she is a member of a protected class; (2) he or she is subjected to unwelcome race-based harassment; (3) the harassment was because of membership in the protected class; and (4) the harassment affected a term, condition, or privilege of his or her employment." *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Singletary v. Mo. Dep't of Corr.,* 423 F.3d 886, 892 (8th Cir. 2005)). If the claim is based on alleged conduct by a co-worker, not a supervisor, there is an added fifth element to establish a *prima facie* case, requiring proof that the employer knew or should have known of the harassment and failed to take appropriate remedial action. *Nichols v. Tri-National Logistics, Inc.*, 809 F.3d 981, 985 (8th Cir. 2016). Actionable harassment must have been both objectively and

subjectively offensive affecting a term of employment. *Bainbridge v. Loffredo Gardens, Inc.*, 378
F.3d 756, 759 (8th Cir. 2004).

"In a hostile work environment claim, evidence concerning all circumstances of the
complainant's employment must be considered, including the frequency of the offending conduct,
its severity, whether it was physically threatening or humiliating, and whether it unreasonably
interfered with work performance." *Kimzey v. Wal-Mart Stores, Inc.*, 107 F.3d 568, 573 (8th Cir.
1997) (citations omitted); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 32 (1993) ("But we
can say that whether an environment is 'hostile' or 'abusive' can be determined only by looking
at all the circumstances."). The Eighth Circuit has "repeatedly emphasized, however, that
frequency is not the only factor [courts] examine—both in situations where [courts] have found
the existence of a hostile work environment and where [courts] have not." *Watson v. CEVA
Logistics, U.S., Inc.*, 619 F.3d 936, 942 (8th Cir. 2010) (citations omitted).

"This is a demanding standard—'conduct must be extreme to amount to a change in the
terms and conditions of employment.'" *Abdel-Ghani v. Target Corp.*, 686 Fed. App'x 377, 379
(8th Cir. 2017) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). "Harassment
which is severe and pervasive is deemed to affect a term, condition, or privilege of employment."
*Stone v. McGraw Hill Fin., Inc.*, 856 F.3d 1168, 1175 (8th Cir. 2017) (quoting *Singletary*, 423
F.3d at 892). "[S]imple teasing, offhand comments and isolated incidents (unless extremely
serious) will not amount to discriminatory changes in the terms and conditions of employment."
*Arraleh v. County of Ramsey*, 461 F.3d 967, 979 (8th Cir. 2006) (quoting *Al–Zubaidy v. TEK
Indus., Inc.*, 406 F.3d 1030, 1039 (8th Cir. 2005)). "'Mere utterance of an epithet which engenders
offensive feelings in an employee does not sufficiently affect the conditions of employment' to
support a claim of hostile work environment." *Id.* (quoting *Elmahdi v. Marriott Hotel Servs., Inc.*,

339 F.3d 645, 653 (8th Cir. 2003)).  "Certainly, 'not every prejudiced remark made at work supports an inference of illegal employment discrimination.'"  *St. Martin v. City of St. Paul*, 680 F.3d 1027, 1035-36 (8th Cir. 2012) (quoting *Arraleh*, 461 F.3d at 975).

Ms. Langel alleges a race-based hostile work environment suffered by her and fellow African-American call takers (Dkt. No. 56, at 60).  As for the first element, AFMC admits that Ms. Langel is a member of a protected group based on her race (Dkt. No. 39, at 10 n.3).

### 1.   Alleged Race-Based Harassment

In her amended complaint, Ms. Langel alleges that AFMC subjected her to a hostile work environment based on her race, which included discouragement, harassment, coarse language, threats of involuntary transfers, relocation, and constructive termination (Dkt. No. 20, ¶ 25).  Ms. Langel maintains that she was forced to work in an environment that tolerated and condoned racist conduct and protected those guilty of exhibiting racist conduct and making racist statements (*Id.*).[8] As for the second element of the *prima facie* case, considering the undisputed record evidence and construing all reasonable inferences in favor of Ms. Langel, the Court concludes that Ms. Langel fails to demonstrate that she was subjected to unwelcome race-based harassment sufficient to be actionable under controlling law.  *See Anderson*, 606 F.3d at 618.

---

[8]  In her amended complaint, Ms. Langel also claims that she was denied benefits, promotions, preferred positions, and desired transfers that were given to Caucasian employees, and she claims that she was subjected to disparate treatment on account of her race in violation of Title VII (Dkt. No. 20, ¶ 26).  There is insufficient record evidence to support allegations that she was denied benefits, promotions, preferred positions, or desired transfers that were given to Caucasian employees.  The undisputed record evidence is that Ms. Langel was hired by AFMC as a Service Center Representative in March 2016 (Dkt. Nos. 40, ¶ 11; 52, ¶ 1) and that she was promoted to a Research Analyst position in AFMC's Service Center's Beneficiary Grievance department in September 2016 and received a pay increase for that promotion (Dkt. No. 40, ¶ 11). She worked in this position for the duration of her employment with AFMC (*Id.*, ¶ 2).  Further, she presents no evidence of comparators outside of her protected class who she contends were treated differently by the same supervisors under the same circumstances.

Although Ms. Langel cites allegations of harassment, she "presents no persuasive evidence that [defendants] took those actions for racially discriminatory reasons." *Tademe v. Saint Cloud State Univ.*, 328 F.3d 982, 991 (8th Cir. 2003) (citation omitted).  Even if Ms. Langel did show that she was subjected to unwelcome harassment, Ms. Langel has failed to show, beyond her subjective belief, that this treatment was due to her membership in a protected group.  *See Anderson*, 606 F.3d at 618.  The inability to establish "a causal connection between the alleged acts of harassment and [her] race" proves fatal to Ms. Langel's claim.  *Stone*, 856 F.3d at 1175.

Most of Ms. Langel's allegations bear, at best, a "tenuous" connection to Ms. Langel's race.  When asked specifically which comments she believed were based on race, Ms. Langel cited the "don't make me crack my whip," "gather my strays," and "itty-bitty brain" comments (Dkt. No. 38-1, at 21-22).  The incidents identified by Ms. Langel and most of the other incidents alleged on her behalf—Ms. Bourn's "gathering my strays" comment; Ms. Bourn's "my side of the fence" comment; the touching incident with Ms. Bourn; the mimicking incident with Ms. Hicks; the building relocations; Mr. Martin's "make this call center great again" comment; the alleged retaliation against Ms. Kelley; Ms. Hicks' alleged "general retaliation campaign" of harassment against Ms. Langel; the discussions of drug screening and potential drug use; the "withholding" of the video footage capturing the touching incident with Ms. Bourn; Ms. Bourn and Ms. Hicks' supervisor evaluations; the email exchanges with Ms. Hurt; Ms. Dunn's alleged harassment and retaliation against Ms. Carter; Ms. Bourn's alleged continued harassment of Ms. Buckner and Ms. Bozeman; and Ms. Hicks' alleged receipt of work accommodations from AFMC—do not bolster Ms. Langel's claim that the acts about which she complains were based on race (Dkt. No. 56, at 20-50).  She presents no competent comparator evidence to support her race discrimination claims.  Other incidents—Ms. Bourn's "south of the border" comment and Mr. Edward's "across the

23

border" comment—might implicate race or national origin but have nothing to do with Ms. Langel's race and her status as a member of a protected group (*Id.*, at 20-21, 23). The remaining incidents—Ms. Bourn's "crack the whip" comments; Ms. Bryant's alleged but unspecified favoritism of Caucasian subordinates with no sufficient comparator evidence cited; Mr. Martin's alleged but unspecified favoritism of Caucasian subordinates with no sufficient comparator evidence cited; and Ms. Bourn's apology—bear at most a tenuous connection to race and are insufficient, even if construed as true and taken collectively, to defeat the summary judgment motion (*Id.*, at 22, 48-49, 56).

## 2.   Sufficiently Pervasive Or Severe

Further, taking all of Ms. Langel's appropriately considered allegations into consideration, the Court finds that these alleged incidents are objectively insufficient to state an actionable claim for hostile environment racial harassment. S*ee Elmahdi v. Marriott Hotel Servs., Inc.,* 339 F.3d 645, 653 (8th Cir. 2003) (holding evidence insufficient to sustain hostile work environment claim); *Burkett v. Glickman,* 327 F.3d 658, 661–62 (8th Cir. 2003) (same).

The Court focuses first on the alleged harassing conduct claimed by Ms. Langel. To summarize the evidence she cites specifically directed at her in support of her claim, she cites the three comments "don't make me crack my whip," "gather my strays," and "itty-bitty brain" comments (Dkt. No. 38-1, at 21-22), the incident with Ms. Bourn, the incident with Ms. Hicks, the move from one building to another, the purported lack of training she received, and the alleged counseling she received. The Court addressed the three comments above. With respect to the incident with Ms. Bourn, Ms., Hicks admits Ms. Bourn was not her direct supervisor but contends she was an indirect supervisor, without explaining that term (Dkt. No. 59, ¶ 18). Ms. Langel admits the forehead taps by Ms. Bourn were painless (Dkt. No. 59, ¶ 28). She acknowledges that, when

24

she complained, the incident was investigated promptly by AFMC, Ms. Bourn apologized, and Ms. Bourn was written up for the incident. AFMC required Ms. Bourn to complete additional training, and Ms. Bourn lost a monetary bonus as a result (Dkt. No. 38-1, at 18-19, 35). Ms. Langel testified in her deposition that, after this incident, she never had another incident with Ms. Bourn (Dkt. No. 38-1, at 19).

With respect to the incident with Ms. Hicks, which occurred approximately one week later, Ms. Langel complained, AFMC said it would investigate, Ms. Langel admitted she knows AFMC made Ms. Hicks aware of the complaint, and after Ms. Langel's complaint, Ms. Hicks did not engage in that type of conduct again (Dkt. No. 38-1, at 21). Ms. Hicks was Ms. Langel's direct supervisor and a member of her team.

With respect to moving from one building to another, Ms. Langel contends that the "white building" is a smaller satellite building, with only one restroom usually in poor working condition, fewer windows, cramped workspace, and a heating system that presented problems in the winter (Dkt. No. 52-2, ¶¶ 8-12). However, the undisputed record evidence is that Ms. Langel's team, at the time of the move in late 2016, was supervised by Ms. Hicks who is Caucasian and who moved buildings with her team (Dkt. Nos. 52-2, ¶¶ 19, 23; 59, ¶ 51). This cannot serve as an example of race-based harassment. Further, with respect to the move back that occurred sometime later, Ms. Langel admits that the "black building" to which her team was moved was a nicer place with more space, had the same types of services, creature comforts, and convenience, and was not a "step-down." (Dkt. No. 38-1, at 47).

In regard to training, Ms. Langel asserts that temporary employees received more training than she did, but she admits that there were both African-American and Caucasian temporary employees, so this cannot serve as an example of race-based harassment (Dkt. No. 38-1, at 11-12).

25

Likewise, there is no evidence in the record of comparators outside the protected class who were treated differently with respect to the alleged counseling Ms. Langel received so as to establish that those acts were taken on account of race (Dkt. No. 38-1, at 25-26).

The Court finds the circumstances alleged in *Abdel-Ghani* and *Arraleh* informative in arriving at its conclusion regarding actionable conduct.  In *Abdel-Ghani*, the plaintiff, a Pakistani employee, alleged that he had been discriminated against on the basis of various protected characteristics.  686 Fed. App'x at 378.  During his two months working at a Bloomington Target, the plaintiff had several offensive comments directed at him or overheard them.  *Id.*  The Eighth Circuit found that while some of these comments were "morally repulsive," these comments did not create a hostile work environment.  *See id.* at 379.  The comments directed at the plaintiff "were not physically threatening," and the plaintiff had "not shown that any of these comments interfered with his work performance."  *Id.*

Similarly, in *Arraleh*, a black Somali employee brought a hostile work environment claim and cited over a dozen instances of racially-charged comments, including:  witnessing coworkers "use words like 'those people,' those damn Muslims"; being "personally . . . insulted, degraded, categorized as lazy and skipping work"; noting that "[e]very time when two people of color go to lunch or talk there is imminent danger for [defendant's] 'white' staff" because "[t]hey assume that their jobs are in jeopardy or we are up to no good"; overhearing a conversation in which an employee said that "giving [plaintiff] a job is like raising terrorist kids"; "[t]oday, your skin doesn't look as white as it normally does"; being referred to as "Mr. Cocoa"; being asked, "[i]s your hair for real?"; "[i]t's very difficult to work with you people"; being told African-Americans are "very difficult to work with" because they are "very emotional" and "take things too personally"; and being told "[b]lack people are expected to leave their blackness behind."  461 F.3d at 972-73, 980.

Despite the nature of these comments, the Eighth Circuit held that "many of the alleged comments were wholly unrelated to [plaintiff's] race or national origin or had a tenuous connection to them." *Id.* at 979.  As such, plaintiff's "evidence [did] not meet the rigorous standards reflected in circuit precedent to support a hostile work environment claim."  *Id.*  Notably, the Eighth Circuit reached this conclusion despite plaintiff's "testi[ying] as to statements he heard various coworkers make" and two of plaintiff's coworkers "testif[ying] to hearing other employees make disparaging remarks not only about [plaintiff] but also about Muslims and African immigrants in general."  *Id.*

As points of contrast, the Court considers *Watson* and *Kimzey*.  In *Watson*, two African-American employees sued their employer, alleging hostile work environment in violation of Title VII and a state law.  *See* 619 F.3d at 936.  The district court granted summary judgment for the employer, and the employees appealed.  *See id.*  The Eighth Circuit reversed and remanded that decision.  *See id.*  The Eighth Circuit found that the employees had established a genuine issue of material fact as to whether a racially hostile work environment existed based on the following facts:  "white employees routinely refused to work with African-American employees," including comments such as a supervisor saying, "[o]h, that's not going to happen," when a white employee was going to be assigned to work with an African-American employee and being told that a certain employee "don't [sic] want to work with black people"; racial graffiti appeared in several locations on company premises; "KKK" and "I hate n****rs" were carved into a workbench in the employees' locker room, and "KKK" was also carved into work lockers; racial slurs were written on the walls and stalls of the bathroom, including the word "n****r"; a railcar had the words "hang a n****r today" painted on its side; "kill the n****rs" and "fuck n****rs" were painted alongside swastikas on railcars; several white coworkers exhibited Confederate flags and other racial emblems at work; white coworkers made false accusations of safety violations against African-

American employees that could have provided grounds for termination; plaintiff had a shuttle accident and was immediately sent for drug testing and suspended, actions which did not occur when a shuttle operated by a white employee experienced the same accident; plaintiff was called to work an overtime shift because a white coworker refused to work with an African-American employee, saying "I told you I wasn't going to work with that n****r"; white coworker stated "I hate them damn n****rs" and falsely reported unsafe behavior from plaintiff; white coworker told plaintiff, "n****r go down there and throw the switch"; white coworker told plaintiff, "I told your black ass I wasn't going to do it"; white coworker called plaintiff "a large black male"; white coworker said "I'm going to get you canned, n****r"; and white coworker, in response to a question, said that he did not like black people; among other incidents. *See id.* at 937-42. These alleged facts were sufficient to support an actionable hostile work environment claim and to meet the Eighth Circuit's demanding standard. *See id.* at 945. The Eighth Circuit found particularly compelling the fact that "[s]everal of the comments were directed at plaintiffs and were made in their presence"; "some of the comments were made in a manner that a jury could reasonably conclude would be particularly demeaning or humiliating to the plaintiffs"; "slurs and other incidents evidencing racial animus were directed at co-workers in the same protected group"; the graffiti and carvings remained visible until the employer acted to remove them; "the display of the Confederate flag by other employees was an ongoing occurrence at the facility"; the company presented "no argument concerning the instances of disparate treatment the plaintiffs describe[d]"; reasonable minds could conclude that plaintiffs alleged instances containing intimidation, threats of physical violence, danger, and sabotage; and defendant "knew or should have known about the harassment and failed to take prompt and effective remedial measures." *Id.* at 943-45.

Despite Ms. Langel invoking *Kimzey* as a case with a purportedly similar fact pattern, *Kimzey* is distinguishable (Dkt. No. 56, at 64). The plaintiff in *Kimzey* brought a discrimination claim under Title VII, arguing that she was treated differently because of her sex, subjected to a hostile work environment, and constructively discharged as a result. *Kimzey*, 107 F.3d at 570. There, the plaintiff alleged the following facts: an assistant store manager ("the manager") gestured toward her bottom and said that "he had found a place to put his screwdriver," and added that the plaintiff "might enjoy it"; her supervisor made a comment about her breasts getting in her way while smacking his lips and making kissing noises; the manager kicked the legs of plaintiff and other female employees when he walked by and once shook a ladder on which plaintiff was standing and laughed when she almost fell; the manager frequently called plaintiff names such as "mother-fucker" and "lazy-son-of-a-bitch"; when plaintiff or other women bent over to pick up merchandise, the manager commented on their "tight-ass jeans"; the manager commented on the women's anatomy and called one female employee a "fat bitch"; her supervisor followed plaintiff around the store and out to the parking lot when she left work, called her names like "damn dummy," "stupid," and "idiot," and regularly yelled at her for extended periods; her supervisor told plaintiff that another employee wanted to assist her when she worked on the ladder so he could look at her "cute ass"; her supervisor screamed and swore at other female employees, as well; and plaintiff was pinched on the buttocks by a co-worker on two separate occasions. *See id.* at 570-71. On these facts, a jury rendered a verdict for plaintiff at trial, and the Eighth Circuit affirmed. *Id.* at 570. The Eighth Circuit found that these facts "demonstrate[d] more than a few isolated incidents of harassment and [were] sufficient to establish a hostile work environment claim" and that it showed the manager and the supervisor "treated women differently from men and that the conduct upset [plaintiff]." *Id.* at 574. Importantly, the Eighth Circuit held that "on this evidence

a reasonable jury could find that [plaintiff] was treated differently *because of her sex*." *Id.*
(emphasis added).

The plaintiffs in both *Watson* and *Kimzey* adequately demonstrated a causal connection
between the hostile behavior and their status as members of a protected group.  Also, in both cases
the alleged conduct's objectively severe or pervasive nature supported an actionable hostile work
environment claim.  On the record evidence before the Court, even with all reasonable inferences
drawn in her favor, Ms. Langel fails to show that the incidents she alleges were tied to her status
as a member of a protected group and to demonstrate an objectively severe or pervasive racially
discriminatory work environment.

The Court acknowledges Ms. Langel's claims regarding the alleged assault and battery by
Ms. Bourn and the alleged assault by Ms. Hicks.  That a supervisor or coworker touched, or
threatened to touch, Ms. Langel does not transform her allegations into an actionable claim.  *See*
*Sutherland v. Mo. Dep't of Corr.*, 580 F.3d 748, 750-51 (8th Cir. 2009) (determining alleged
harassment was not sufficiently severe or pervasive for hostile work environment claim despite
allegation of offensive touching); *Anderson v. Family Dollar Stores of Ark., Inc.,* 579 F.3d 858,
862 (8th Cir. 2009) (rejecting hostile work environment claim where a supervisor had rubbed an
employee's back and shoulders, called her "baby doll," "accus[ed] her of not wanting to be 'one
of [his] girls,'" suggested once in a long-distance phone call "that she should be in bed with him,"
and "insinuat[ed] that she could go farther in the company if she got along with him"); *LeGrand*
*v. Area Res. for Cmty. & Human Servs.,* 394 F.3d 1098, 1100-03 (8th Cir. 2005) (determining no
actionable hostile work environment harassment when plaintiff alleged that a harasser asked him
to watch pornographic movies and to masturbate together, suggested that the plaintiff would
advance professionally if the plaintiff caused the harasser to orgasm, kissed the plaintiff on the

mouth, "grabbed" the plaintiff's buttocks, "brush[ed]" the plaintiff's groin, "reached for" the plaintiff's genitals, and "briefly gripped" the plaintiff's thigh); *Alagna v. Smithville R-II Sch. Dist.,* 324 F.3d 975, 976-80 (8th Cir. 2003) (finding male teacher's inappropriate conduct toward female faculty member over two school years, such as touching her, commenting on her appearance, saying "I love you," exhibiting a demeanor of a sexual nature, calling her many times at home, and giving her two romance novels and another gift, was "not sufficiently severe or pervasive"); *Duncan v. Gen. Motors Corp.,* 300 F.3d 928, 931-35 (8th Cir. 2002) (finding no severe or pervasive harassment where male co-worker made a pass at plaintiff including but not limited to touching her hand and proposing a relationship when plaintiff had to work with the male co-worker for three years, suffering additional boorish behavior until she resigned).

Further, the Court considers neither the touching incident with Ms. Bourn nor the mimicking incident with Ms. Hicks to be objectively sufficiently "physically threatening" or "humiliating" to be actionable under the circumstances. The touching incident with Ms. Bourn involved one incident of around four taps on Ms. Langel's forehead (Dkt. No. 38-7). Ms. Langel concedes that the taps were painless, although she characterizes her perception of them as disrespectful, intimidating, and humiliating (Dkt. No. 59, ¶ 28). The mimicking incident involved no physical contact, and, at worst, Ms. Hicks on one occasion mimicked Ms. Bourn's taps on Ms. Langel's forehead (*Id.*, ¶ 32).

The Court also has considered the record evidence of alleged harassment of employees other than Ms. Langel when evaluating her hostile environment claim. *See Sandoval v. Am. Guilding Maint. Indus., Inc.*, 578 F.3d 787, 803 (8th Cir. 2014); *Howard v. Burns Bros., Inc.,* 149 F.3d 835, 838 (8th Cir. 1998). In the cases in the Eighth Circuit where courts have considered conduct directed at others in upholding harassment claims, that conduct augmented evidence of

harassment directed at the plaintiff, *see, e.g., id.* (evidence of harassment of others augmented evidence of physical contact of plaintiff and chronic innuendos); *Hall v. Gus Const. Co.,* 842 F.2d 1010, 1015 (8th Cir. 1988) (each plaintiff endured abuse). "Abuse directed at a third party is part of the picture, but it is less significant than abuse directed at the plaintiff." *See Hocevar v. Purdue Frederick Co.*, 223 F.3d 721, 741 (8th Cir. 2000) (citing *Gleason v. Mesirow Fin., Inc.,* 118 F.3d 1134, 1144-45 (7th Cir. 1997)) (noting that "second-hand harassment" is not as great of an invasion as harassment directed at plaintiff); *see also Black v. Zaring Homes, Inc.,* 104 F.3d 822, 826 (6th Cir. 1997) (determining that fact most comments were not directed at plaintiff contributed to conclusion of insufficiency of evidence). The Court observes specifically regarding the declarations of Ms. Bozeman and Ms. Carter that, aside from alleging certain facts specific to Ms. Bozeman with respect to alleged discriminatory promotion and facts that occurred months after Ms. Langel resigned from AFMC, Ms. Bozeman repeats nearly all of the allegations made by Ms. Langel that the Court has already addressed and that Ms. Carter focuses on non-specific claims of retaliation most of which are not tied to race but instead allegedly resulted after Ms. Carter made Ms. Langel aware of the videotape of the incident with Ms. Bourn (Dkt. Nos.  No. 52-11; 52-13).

### 3.       A Term, Condition, Or Privilege Of Employment

Ms. Langel's claim also fails due to "the absence of evidence that the comments interfered with [her] ability to perform [her] duties" at AFMC. *Arraleh*, 461 F.3d at 979. Even if Ms. Langel satisfied the first three elements of a hostile work environment claim, Ms. Langel fails to demonstrate how the alleged harassment and attendant hostile work environment affected a term, condition, or privilege of her employment. The record evidence shows that none of the complained of conduct by Ms. Bourn and/or Ms. Hicks occurred at AFMC after Ms. Langel's complaints (Dkt. No. 40, ¶ 40). At all times, Ms. Langel received good job evaluations during her employment in

the Service Center (Dkt. No. 40, ¶ 13).  Further, Ms. Langel was never disciplined other than a single verbal counseling about being late in completing a particular training course, never applied for any other positions within AFMC, and was provided all requests for time off during her entire employment, though she was sometimes forced to take leave without pay (*Id.*, ¶¶ 14-16; Dkt No. 59, ¶ 16).

She claims constructive discharge as the adverse employment action.  To prove a constructive discharge, an employee must show that the employer deliberately created intolerable working conditions with the intention of forcing her to quit.  *Coffman v. Tracker Marine, L.P.,* 141 F.3d 1241, 1247 (8th Cir. 1998).  "To prove a case of constructive discharge, a plaintiff must show (1) a reasonable person in [her] situation would find the working conditions intolerable, and (2) the employer intended to force [her] to quit."  *Rickard v. Swedish Match N. Am., Inc.*, No. 3:12-CV-00057 KGB, 2013 WL 12099414, at *10 (E.D. Ark. Nov. 25, 2013), *aff'd*, 773 F.3d 181 (8th Cir. 2014) (quoting *Anda v. Wickes Furniture Co., Inc.*, 517 F.3d 526, 534 (8th Cir. 2008)).  "The intolerability of working conditions is judged by an objective standard, not the employee's subjective feelings." *Sanders v. Lee Cnty. Sch. Dist. No. 1*, 669 F.3d 888, 893 (8th Cir. 2012) (footnote omitted) (quoting *Tatom v. Georgia-Pacific Corp.*, 228 F.3d 926, 932 (8th Cir. 2000)) . "Accordingly, to prevail on a constructive discharge claim, a plaintiff must show that his 'working conditions were rendered so objectionable that a reasonable person would have deemed resignation the only plausible alternative.'" *Rickard*, 2013 WL 12099414, at *10 (quoting *Tatom,*, 228 F.3d at 932).  Further, a constructive discharge claim carries a higher evidentiary burden than a hostile work environment claim.  *See Penn. State Police v. Suders*, 542 U.S. 129, 147 (2004) ("A hostile-environment constructive discharge claim entails something more [than an actionable hostile work environment.").  A claim of "[c]onstructive discharge requires considerably more proof than an

unpleasant and unprofessional environment." *Duncan*, 300 F.3d at 936 (quoting *Jones v. Fitzgerald*, 285 F.3d 705, 716 (8th Cir. 2002)). "An employee who quits without giving [his] employer a reasonable chance to work out a problem has not been constructively discharged." *Id.* at 935.

Ms. Langel admits Ms. Bourn was not her direct supervisor but instead claims she was an indirect supervisor (Dkt. No. 59, ¶ 18). Ms. Langel continued working at AFMC until February 2018 (Dkt. Nos. 38-12; 39, at 3). Ms. Langel claims that AFMC's moving her team to the black building away from Ms. Bourn initially was racially discriminatory, but Ms. Langel then contends that, sometime after her team transferred back to the white building, she resigned to avoid working in the same building as Ms. Bourn (Dkt. No. 38-1, at 30). She was cleared to return to work without restrictions on February 22, 2018, but she resigned instead on that date purportedly at the recommendation of her psychologist (Dkt. Nos. 38-12; 40, ¶¶ 44, 46-47; 59, ¶ 46). Ms. Langel never requested from AFMC a job transfer or change of departments (Dkt. No. 40, ¶ 47). On the undisputed record evidence, even with all reasonable inferences construed in favor of Ms. Langel, AFMC is entitled to summary judgment on her allegations of constructive discharge purportedly resulting from a race-based hostile work environment.

### 4.    Appropriate Remedial Action

Given the record evidence, it appears that some of the conduct about which Ms. Langel complains may be attributed to co-workers, not direct supervisors. In that situation, the employer cannot be vicariously liable for the co-worker's harassment. *Engel v. Rapid City Sch. Dist.*, 506 F.3d 1118, 1123 (8th Cir. 2007) (citing *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765 (1998); *Faragher*, 524 U.S. at 807-08). An employer may be *directly* liable for a co-worker's harassment, however, if the employer knew or should have known of the conduct and failed to take proper

remedial action.  *Id.*  (citing *Merritt v. Albemarle Corp.,* 496 F.3d 880 (8th Cir. 2007); *Dhyne v. Meiners Thriftway, Inc.,* 184 F.3d 983, 987 (8th Cir. 1999)).

It is well established law that, "[o]nce an employer becomes aware of harassing conduct, it must promptly take remedial action which is reasonably calculated to end it."  *Powell v. Yellow Book USA, Inc.*, 445 F.3d 1074, 1078 (8th Cir. 2006) (alterations omitted) (quoting *Kopp v. Samaritan Health Sys., Inc.*, 13 F.3d 264, 269 (8th Cir. 1993)).  Under this theory, the employer "may be culpable for harassment to which it did not adequately respond, on the theory that 'the combined knowledge and inaction may be seen as demonstrable negligence, or as the employer's adoption of the offending conduct and its results, quite as if they had been authorized affirmatively as the employer's policy.'"  *Engel*, 506 F.3d at 1123–24 (quoting *Faragher*, 524 U.S. at 789).

When determining whether an employer has acted sufficiently to remedy the alleged harassment, courts consider a variety of factors, including:  (1) the temporal proximity between the harassment and the remedial action; (2) the options available to the employer to remedy the harassment—"such as employee training sessions and disciplinary action taken against the harassers"; and (3) whether or not the remedial action actually ended the harassment.  *Jenkins v. Winter*, 540 F.3d 742, 749 (8th Cir. 2008) (quoting *Arraleh*, 461 F.3d at 979).

The undisputed record evidence, through Ms. Langel's own testimony, establishes that AFMC responded in some capacity to all of the complaints she made (Dkt. No. 38-1, at 35-36).  She does not dispute that, when she complained about Ms. Bourn, AFMC promptly investigated, Ms. Bourn apologized, AFMC required Ms. Bourn to complete additional training, and Ms. Bourn lost a monetary bonus as a result (*Id.*, at 18-19, 35).  Ms. Langel never had another incident with Ms. Bourn (*Id.*, at 19).  Ms. Langel complained about the incident with Ms. Hicks, AFMC said it would investigate, and even Ms. Langel concedes that AFMC made Ms. Hicks aware of the

complaint; Ms. Hicks did not engage in that type of conduct again after Ms. Langel complained (*Id.*, at 21).

For the foregoing reasons, the Court finds no genuine issue of material fact regarding Ms. Langel's hostile work environment race discrimination claim and grants summary judgment in favor of defendants on this claim.

### B.   Retaliation

"Title VII forbids an employer from 'discriminat[ing] against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].'" *Liles v. C.S. McCrossan, Inc.*, 851 F.3d 810, 818 (8th Cir. 2017) (quoting 42 U.S.C.§ 2000e-3(a)).  To establish a retaliation claim under Title VII, "a plaintiff must first establish a prima facie case by showing that he or she:  '(1) engaged in statutorily protected activity; (2) he [or she] suffered an adverse employment action, and (3) there was a causal connection between the adverse employment action and the protected activity.'" *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 880 (8th Cir. 2005) (quoting *E.E.O.C. v. Kohler Co.*, 335 F.3d 766, 772 (8th Cir. 2003)).  "[T]he threshold of proof necessary to establish a *prima facie* case is minimal." *Young v. Warner-Jenkinson Co., Inc.*, 152 F.3d 1018, 1022 (8th Cir. 1998) (citations omitted).  "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 339 (2013).  "Even at summary judgment, '[a] plaintiff can establish a causal connection between his complaints and an adverse action through circumstantial evidence, such as the timing of the two events.'" *Wilson v. Ark. Dep't of Human Servs.*, 850 F.3d 368, 373 (8th Cir. 2017) (quoting *Turner v. Gonzales*, 421 F.3d 688, 696-97 (8th Cir. 2005)).  However, "[g]enerally, more

36

than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." *Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 761 (8th Cir. 2004) (quoting *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc)).

Ms. Langel alleges that she was retaliated against for reporting supervisory misconduct, instances of racial hostility, the touching incident with Ms. Bourn, and the mimicking incident with Ms. Hicks, among other things (Dkt. Nos. 20, ¶ 32; 56, at 72).   The Court considers Ms. Langel's actions—filing an EEOC charge, communicating with supervisors and Human Resources about employment discrimination, and answering questions during an employer investigation, among other things—protected activity under Title VII.   *See Sutherland*, 580 F.3d at 752. Defendants nowhere contend that Ms. Langel engaged in unprotected activity, signaling that this fact is not contested (Dkt. Nos. 39, 58).

In her amended complaint, Ms. Langel alleges retaliation by AFMC, through its employees, agents, and/or servants, in the following forms:  (1) by allowing Ms. Bourn to commit assault and battery upon Ms. Langel; (2) by not disciplining Ms. Bourn for assault and battery committed upon Ms. Langel; (3) by not disciplining Ms. Hicks for assault committed upon Ms. Langel; (4) by relegating Ms. Langel and other African-American AFMC employees who spoke out against racial discrimination in the workplace to a remote area of the work grounds; (5) by limiting Ms. Langel and other African-American AFMC employees' access to training and other retaliatory, punitive measures; (6) by forcing Ms. Langel's constructive termination; and (7) by improperly placing Ms. Langel on an industry "do not rehire" list after forcing her constructive termination (Dkt. No. 20, ¶ 32).

In furtherance of her retaliation claim, Ms. Langel asserts that the adverse employment action she suffered was that she was constructively discharged by AFMC (Dkt. No. 56, at 42). Ms. Langel alleges no other credible actionable adverse employment action taken against her. Ms. Langel admits that she has never been disciplined by AFMC other than a single verbal coaching for not completing a particular training course on time, after which Ms. Langel swiftly completed the course (Dkt. Nos. 39, at 16; 52-1, at 10). Ms. Langel was never demoted, denied a promotion, suspended, or terminated (Dkt. Nos. 39, at 16; 52-1, at 10). She never applied for any other promotions or job transfers or requested any workplace accommodations and, as such, has never been denied any such requests (Dkt. No. 38-6, ¶ 9).

The Court rejects the remainder of her claims as demonstrating adverse employment action. Specifically, with respect to these claims: (1) AFMC did not allow and in fact specifically prohibited the very conduct from the touching incident reported by Ms. Langel; (2) Ms. Bourn was disciplined for the touching incident; (3) evidence in the record shows that Ms. Hicks was disciplined for the mimicking incident; (4) the *entire* Service Center was moved to the white building around December 2016, including Ms. Langel; Ms. Langel's entire team, including Ms. Hicks, a Caucasian employee, was moved back to the black building for operational purposes in July 2017; the two buildings are adjacent to rather than remote from one another; (5) AFMC provided Ms. Langel with the same training as all other employees on her team and other comparable positions, and her allegation only stems from a group of temporary employees, including African American and Caucasian temporary employees, whom she believes received additional training that neither Ms. Langel nor anyone else on her team received; Ms. Langel communicated with Ms. Hurt about training and confirmed that she did not need the specific form of training at issue; Ms. Hurt informed Ms. Langel that she should let Ms. Hurt know if she ever

felt the need for additional training; and (6) Ms. Langel was not placed on an industry "do not rehire" list—no such list appears to exist—but rather classified as ineligible for rehire at AFMC due to her failure to provide two weeks' notice prior to her resignation per company policy (Dkt. Nos. 39, at 18-21; 52-4, at 81-82)

Ms. Langel neither suffered nor can show any direct adverse employment action based on these allegations, so her retaliation claim hinges on her constructive discharge allegation. Thus, Ms. Langel must show that she was constructively discharged and that the protected activity she engaged in was the but-for cause of her constructive discharge to prevail on her retaliation claim. Ms. Langel can do neither. She "premises her constructive discharge claim on the same allegations [the Court] found insufficient to establish a hostile work environment." *O'Brien v. Dep't of Agric.*, 532 F.3d 805, 811 (8th Cir. 2008). "As such, her claim fails." *Id.* (citations omitted); *see also Smith v. Fairview Rides Hosp.*, 625 F.3d 1076, 1087 (8th Cir. 2010) ("Because we have already concluded that [plaintiff] has not successfully shown that her hostile work environment claim should have survived summary judgment, her constructive discharge claim also fails."), *abrogated on other grounds by Torgerson*, 643 F.3d at 1043; *Hughes v. Goodwill Indus. of Ark., Inc.*, No. 4:14-cv-00506 SWW, 2015 WL 4776787, at *6 (E.D. Ark. Aug. 4, 2015) (same). She also fails to establish but-for causation on the record evidence. For these reasons, the Court finds no genuine issue of material fact regarding Ms. Langel's retaliation claim and grants summary judgment for defendants on this claim.

### C.      Remaining State Law Claims

Because the Court grants summary judgment in favor of defendants on Ms. Langel's federal hostile work environment race discrimination and retaliation claims, the Court declines to exercise supplemental jurisdiction over her remaining assault and battery and negligent

supervision claims.  The Court dismisses without prejudice those claims.  *See Ivy v. Kimbrough,* 115 F.3d 550, 552-53 (8th Cir. 1997) (explaining that when all federal claims are dismissed pendent state claims are usually "dismissed without prejudice to avoid '[n]eedless decisions of state law . . . as a matter of comity and to promote justice between the parties.'" (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1966))).

### VII.    Conclusion

For the above reasons, the Court grants defendants' motion for summary judgment and enters judgment in favor of defendants AFMC and Ms. Bourn on Ms. Langel's discrimination and retaliation claims (Dkt. No. 38).  The Court dismisses with prejudice these claims (Dkt. No. 20, ¶¶ 19-33).  Ms. Langel's request for relief on these claims is denied (*Id.*, at 11).  The Court declines to exercise supplemental jurisdiction over Ms. Langel's remaining state law claims for assault and battery and negligent supervision, and the Court dismisses without prejudice those claims.  The Court grants Ms. Langel's two motions for extension of time to file a response to defendants' motion for summary judgment and considers Ms. Langel's response timely filed (Dkt. Nos. 45, 47, 56).  The Court grants in part and denies in part AFMC's motion to strike Ms. Langel's response to defendants' statement of undisputed material facts (Dkt. No. 60).  The Court denies as moot AFMC's motion for protective order (Dkt. No. 66).  Judgment will be entered accordingly.

So ordered this 2nd day of September, 2021.

Kristine G. Baker
United States District Judge

40